1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF HAWAII

3

   UNITED STATES OF AMERICA,      ) CR NO.
4                                 ) 13-00735 LEK
             Plaintiff,           )
5                                 )
   vs.                            )
6                                 )
   GERALD K. PUANA,               )
7                                 )
             Defendant.           )
8                                 )

9                        )

10

11

12

13        VIDEOTAPED DEPOSITION OF FLORENCE PUANA

14

15   Taken on behalf of Plaintiff, on August 21, 2014,

16   commencing at 10:05 a.m., at the United States

17   Attorney's Office, PJKK Federal Building, 300 Ala

18   Moana Boulevard, Room 6-100, Honolulu, Hawaii,

19   before Rita King, a Certified Court Reporter in the

20   State of Hawaii.

21

22

23

24

25               EXHIBIT "A"

Page 2

COUNSEL APPEARING:

For Plaintiff:

        LESLIE E. OSBORNE, JR., ESQ.
        United States Attorney
        PJKK Federal Building
        300 Ala Moana Boulevard, Room 6-100
        Honolulu, Hawaii 96813

For Defendant:

        ALEXANDER SILVERT, ESQ.
        First Assistant Federal Public Defender
        PJKK Federal Building
        300 Ala Moana Boulevard, Room 7-104
        Honolulu, Hawaii 96813

Videographer:

        Alan Nielsen
        Certified Legal Video Services
        1111 Bishop Street, Suite 500
        Honolulu, Hawaii 96816

Page 3

INDEX

WITNESS                                          PAGE

FLORENCE PUANA

   Examination by Mr. Silvert                    4
   Voir Dire Examination by Mr. Osborne    12
   Examination by Mr. Silvert (cont'd)     20
   Voir Dire Examination by Mr. Osborne    22
   Examination by Mr. Silvert (cont'd)     26
   Voir Dire Examination by Mr. Osborne    28
   Examination by Mr. Silvert (cont'd)     30
   Voir Dire Examination by Mr. Osborne    32
   Examination by Mr. Silvert (cont'd)     35
   Examination by Mr. Osborne              42
   Further Examination by Mr. Silvert      54
   Further Examination by Mr. Osborne      55

EXHIBITS

Deposition
Exhibits   Description            Marked

   A    Letter 9/10/12              26
   B    Durable Power of Attorney   11
   C    Complaint                   21
   D    Letter 1/29/13              31

Page 4

                    FLORENCE PUANA,
a witness herein, having been first duly sworn, was
examined and testified as follows:


                    EXAMINATION
BY MR. SILVERT:
        Q.   Can you tell us what your name is, ma'am.
        A.   My name is Florence Medeiros Puana.
        Q.   Is that your married name?
        A.   Yes, it is.
        Q.   What is your maiden name?
        A.   Medeiros.
        Q.   And how old are you?
        A.   I am 94 years old.
        Q.   What is your date of birth?
        A.   August the 24th, 1919.
        Q.   So you'll be 95 next week?
        A.   Sunday.
        Q.   Where were you born?
        A.   I was born in Makawao, Maui.
        Q.   And where did you grow up?
        A.   I grew up in Haleakala Ranch.
        Q.   Is that on Maui?
        A.   Yes, that's where we lived.
        Q.   Where do you live now?

Page 5

        A.   I live with my daughter, in Kailua.
        Q.   Is that Oahu?
        A.   Yes, it is.
        Q.   And what's your daughter's name?
        A.   Charlotte Malott, M-A-L-O-T-T.
        Q.   How long have you lived in Hawaii?
        A.   All my life.
        Q.   How long did you live on Maui?
        A.   22 years.
        Q.   And then after Maui you came to Honolulu?
        A.   Yes, I did.
        Q.   How many children do you have?
        A.   Nine children.
        Q.   And is Gerard Puana your child?
        A.   Yes.  He's my oldest son.  My youngest
son.
        Q.   Do you have any grandchildren?
        A.   Yes, I do.  I have grandchildren, great
grandchildren and great-great grandchildren.
        Q.   When you were on Maui, did you go to
school?
        A.   Yes, I did.
        Q.   What was the name of the school?
        A.   I went to Makawao public school.
        Q.   How far did you go in school?

2 (Pages 2 to 5)

Page 6

1     A.   I went to the eighth grade.
2     Q.   After the eighth grade, did you get any
3 more formal education?
4     A.   No, I didn't.
5     Q.   What did you do after eighth grade, on
6 Maui?
7     A.   Summertime, I worked in the fields, and
8 after summer I worked in the cannery.
9     Q.   Did you get married?
10    A.   Yes, I did.
11    Q.   And how long were you married?
12    A.   64 years.
13    Q.   Is your husband still alive?
14    A.   No, he isn't.
15    Q.   Do you remember when you moved to Oahu?
16    A.   Yes, in 1941.
17    Q.   When you came to Oahu -- so that was
18 1941. Is that before Pearl Harbor?
19    A.   Pearl Harbor was in December, and I came
20 here in June.
21    Q.   Did you work when you came to Oahu?
22    A.   No, I didn't.
23    Q.   So what did you do at first?
24    A.   I was a housewife.
25    Q.   Did you eventually get a job?

Page 7

1     A.   Yes, I did.
2     Q.   And what did you do?
3     A.   I worked for Star of the Sea Church.
4     Q.   And what did you do there?
5     A.   I did cleaning and ironing.
6     Q.   How long did you work for the Star of the
7 Sea Church?
8     A.   32 years.
9     Q.   Is that where you retired?
10    A.   Yes.
11    Q.   I take it now you are not working.
12    A.   I am not working at this time.
13    Q.   So can you tell us how you feel today?
14    A.   I feel fine.
15    Q.   Are you taking any medications?
16    A.   Yes, I am.
17    Q.   And do you have any medical problems?
18    A.   Yes. I have glaucoma, and I have aortic
19 stenosis, and I also have osteoporosis and
20 glaucoma.
21    Q.   Do you take medicines for those problems?
22    A.   Yes, I do.
23    Q.   Let's go through. What is glaucoma, what
24 do you understand it to be?
25    A.   Glaucoma is the eye pressure, and I take

Page 8

1 drops.
2     Q.   Do those drops affect your ability to
3 understand or your memory?
4     A.   No, it does not.
5     Q.   And what's the other thing you have?
6     A.   I have osteoporosis, that's a thinning of
7 the bones.
8     Q.   And do you take medicine for that?
9     A.   Yes, I do.
10    Q.   And does that medicine affect your
11 ability to think?
12    A.   No, it does not.
13    Q.   And what's the other issue you have?
14    A.   I have aortic stenosis, it's a hardening
15 of the valve, my heart valve.
16    Q.   And do you take medicine for that?
17    A.   Yes, I do.
18    Q.   And does that affect your ability to
19 remember or understand?
20    A.   No.
21    Q.   Do you take medicines at night?
22    A.   Yes, I do.
23    Q.   And what's that for?
24    A.   Pravastatin is for my cholesterol, and
25 the other one is mertropozine(phonetic), or

Page 9

1 something, it's to relax so I can go to sleep, just
2 to relax. It's not a drug or anything, it's just
3 a --
4     Q.   To help you sleep.
5     A.   Yes.
6     Q.   And you only take that at night.
7     A.   At night.
8     Q.   Do you feel alert now?
9     A.   Yes, I do.
10    Q.   Can you identify your son, Gerard Puana,
11 is he in the room?
12    A.   Yes, he is in the room.
13    Q.   Can you point to him?
14    A.   Yes. (Witness pointing.)
15    Q.   What's he wearing?
16    A.   He's wearing an aloha shirt.
17        MR. SILVERT: Can the record reflect that
18 she identified Gerard Puana.
19        MR. OSBORNE: Yes.
20    Q.   BY MR. SILVERT: Do you know a person
21 named Katherine Kealoha?
22    A.   Yes, she is my granddaughter.
23    Q.   And do you know who her husband is?
24    A.   Yes.
25    Q.   What's his name?

3 (Pages 6 to 9)

Page 10

1    A.   Louis Kealoha.
2    Q.   And do you know a person by the name of
3  Bobby Nguyen?
4    A.   Yes, I do.
5    Q.   And who is he?
6    A.   He's my great-granddaughter's husband.
7    Q.   And do you know what he does?
8    A.   He's a police officer.
9    Q.   And he's related to Katherine Kealoha as
10  well?
11    A.   Yes.  Through marriage.
12    Q.   Do you understand that you took an oath
13  today to testify truthfully?
14    A.   Yes, I did.
15    Q.   Can you tell us what that means.
16    A.   It means if you tell a lie you can go to
17  jail.
18    Q.   Are you going to tell a lie today?
19    A.   No, I am not.
20    Q.   Did there come a time when you gave
21  Katherine Kealoha a power of attorney to act on
22  your behalf?
23    A.   Yes, I did.
24    Q.   Why did you do that?
25    A.   I wanted her to have a reverse mortgage

Page 11

1  for me, my house, so I could buy a condominium for
2  my son.
3    Q.   And when you say your son, who --
4    A.   Gerard Puana.
5    Q.   So you wanted her to act on your behalf.
6    A.   Yes.
7    Q.   And did you prepare a document that gave
8  her that power?
9    A.   Yes, I did.
10    Q.   And did you sign that document?
11    A.   Yes, I did.
12    Q.   I'm going to show you what's been marked
13  as Defense Exhibit B.
14    (Exhibit B was marked for
15  identification.)
16    Q.   BY MR. SILVERT:  Can you look at that
17  document.  Do you recognize that document?
18    A.   Yes.
19    Q.   And what is that document?  Before you do
20  that, can you turn to the last page, please.  Do
21  you see a signature there?
22    A.   Yes, I do.
23    Q.   Is that your signature?
24    A.   Yes, it is.
25    Q.   Is that the document that you gave

Page 12

1  Katherine Kealoha so she could act as your
2  attorney?
3    A.   Yes, that's the document.
4    MR. SILVERT:  I would ask that it be
5  moved into evidence.
6    MR. OSBORNE:  And I ask to voir dire the
7  witness, please.
8
9    VOIR DIRE EXAMINATION
10  BY MR. OSBORNE:
11    Q.   Did you prepare that document?
12    A.   I did not, no, my attorney did.
13    Q.   And who is that?
14    A.   It's Gerald Kurashima.
15    Q.   Was it your idea to contact
16  Mr. Kurashima?
17    A.   Yes, it was.
18    Q.   Or did he contact you?
19    A.   Well, I asked him.
20    Q.   Hadn't you, in fact, talked about this
21  power of attorney and the need for it with
22  Mr. Puana, the gentleman seated here?
23    A.   Yes, I did.
24    Q.   And you did that before this document; is
25  that right?

Page 13

1    A.   Well, I did this after I -- no, it was
2  the 7th of January 2009.
3    Q.   I know that, ma'am.  What I'm asking you
4  is:  Hadn't Mr. Puana, your son, talked to you
5  about the need for this document before you
6  contacted the lawyer?
7    A.   Yes.
8    MR. SILVERT:  I would object, that this
9  is not proper voir dire.
10    MR. OSBORNE:  Well, I guess we'll have to
11  take that up with the court.
12    Q.   So you may answer that question, ma'am.
13    Did you talk to your son about the need
14  for this document before you met with the lawyer?
15    A.   Yes, I did.
16    Q.   And after you met with your son, and what
17  he told you, you decided to meet with the lawyer.
18    A.   Yes.
19    Q.   And when you met with the lawyer, why did
20  you think you needed this power of attorney?
21    A.   Because I wanted Kathy to be my attorney.
22    Q.   For what purpose?
23    A.   So she could do a reverse mortgage, and
24  so we could get the money to buy my son a
25  condominium.

Page 14

1    Q.   You said your granddaughter.  What's her
2    name?
3    A.   My name?
4    Q.   The granddaughter.
5    A.   Katherine Kealoha.
6    Q.   And she's an attorney.
7    A.   Yes, she is.
8    Q.   Did you talk to her about having this
9    power of attorney?
10   A.   Well, she came to the house, and I spoke
11   to her about it.
12   Q.   Before or after?
13   A.   Before.
14   Q.   And how was this particular lawyer
15   selected, the lawyer who drafted the power of
16   attorney?
17   A.   Well, he told me that --
18   Q.   I'm sorry, but you can't tell us what he
19   told you, that's hearsay.
20        So why did you go to that particular
21   lawyer, was it your decision to go to that lawyer
22   or did somebody else tell you?
23   A.   Well, I was told to go to -- he was the
24   first attorney I went to, and that was Yano,
25   Attorney Francis Yano.

Page 15

1    Q.   And who told you to see him?
2    MR. SILVERT:  Objection, hearsay, beyond
3    the scope of a voir dire.
4    Q.   BY MR. OSBORNE:  Who told you to see him?
5    A.   To get this power of attorney?
6    Q.   Correct.
7    A.   Well, I spoke to Gerry about it.
8    Q.   You spoke to who?  I'm sorry I didn't
9    hear.
10   A.   My son, Gerry.
11   Q.   Okay.  And your son, Jimmy, picked out
12   the lawyer, correct?
13   A.   No, I did.
14   MR. SILVERT:  It's Gerry.
15   MR. OSBORNE:  Gerry, I'm sorry.
16   THE WITNESS:  I did.
17   Q.   BY MR. OSBORNE:  And why did you pick
18   that lawyer?
19   MR. SILVERT:  Objection, improper
20   question.
21   Q.   BY MR. OSBORNE:  And why did you pick
22   that lawyer?
23   A.   I can't understand your question.
24   Q.   Well, what part of:  Why did you pick
25   that lawyer don't you understand?

Page 16

1    A.   Well, I picked that lawyer because I
2    spoke to him.
3    Q.   Why did you speak to him?
4    A.   Because I wanted to have my granddaughter
5    be my attorney and --
6    Q.   I'm sorry.  How did you learn his name?
7    A.   Well, I went to the office, and I spoke
8    to him.
9    Q.   And how did you get to his office?
10   A.   Well, they told me where it was, and I
11   went.
12   Q.   Who is "they?"
13   A.   I don't understand.
14   Q.   Someone told you to go see Mr. Yano.
15   A.   Well, I did not go to Mr. Yano, that is
16   where I couldn't remember what he said.  So I did
17   not, I just wanted -- this was before I went to see
18   the attorney.
19   Q.   May I see the document, please.  Just a
20   second.  I want to see what you have before you.
21   Thank you.
22        What is the name of the lawyer who --
23   A.   I'm sorry, this is not the document I'm
24   talking about, this is the one that I spoke to my
25   granddaughter about having that mortgage, for me,

Page 17

1    the reverse mortgage, this is the one that I -- she
2    was the one, she told me that:  Grandma, I'll be
3    your attorney.  And I said:  Okay.  So it was after
4    this that I got an attorney.
5    Q.   And who is that attorney?
6    A.   That attorney was Francis Yano.
7    Q.   And how did you learn about Mr. Francis
8    Yano?
9    A.   He went to the school that I worked for.
10   His family went there, and I knew of him.
11   Q.   And so you chose him.
12   A.   Yes.
13   Q.   Now, who drafted this document, who wrote
14   it up?
15   A.   My daughter, Kay Hartsell, because I told
16   her what to write.  Not this one, not this one, but
17   the one --
18   Q.   I'm sorry, ma'am.  Did you say not in
19   this one?
20   MR. SILVERT:  She said not this document.
21   She's talking about a different document.
22   Q.   BY MR. OSBORNE:  Well, let's get back to
23   this document.  I don't want to talk about any
24   other document but this document.
25   A.   All right.  Well, since she came up to me

Page 18

1  one day --
2      Q.  Who is "she?"
3      A.  Katherine Kealoha.
4          She came to my house and spoke to me
5  about it because that document, that condominium
6  was for sale.
7      Q.  This is the condominium you wanted as a
8  timeshare for your son.
9      A.  Yes.
10         And then she told me:  I can be your
11  attorney.  And the mother, her mother, said:  Yes,
12  she can be your attorney, she's your granddaughter,
13  you can trust her.  So that's when I did this.
14     Q.  And who actually drafted the power of
15  attorney, this document, Exhibit B?
16     A.  That was Katherine Kealoha.
17     Q.  And she typed all of the information
18  that's in this power of attorney.
19     A.  She did that because she was my -- I
20  trusted her.  She was my attorney, so I trusted
21  her.
22     Q.  She's your granddaughter and your lawyer,
23  right?
24     A.  Yes.
25     Q.  Yeah.  And she drafted this up --

Page 19

1      A.  My granddaughter and my lawyer?
2      Q.  At the time, she was your lawyer, right?
3      A.  Yes.
4      Q.  And your granddaughter/lawyer drafted up
5  what we're now calling Exhibit 3; is that right?
6      A.  Yes.
7          MR. SILVERT:  Exhibit B.
8          MR. OSBORNE:  B, I'm sorry.  Now I'm
9  confused.
10     Q.  And you --
11         THE VIDEOGRAPHER:  Excuse me, counsel, I
12  need you to put your microphone back on, please.
13     Q.  BY MR. OSBORNE:  Oh, it fell off.  Thank
14  you.
15         And it was your granddaughter who
16  prepared the language in Exhibit B; is that right?
17     A.  Yes, she took care of all of my papers.
18     Q.  And before you signed it she discussed it
19  with you.
20     A.  Yes, she did.
21     Q.  And you were satisfied that this is what
22  you wanted to accomplish.
23     A.  Yes, because I trusted her.
24     Q.  And is there anything in this document,
25  Exhibit B, that you disagree with?

Page 20

1          MR. SILVERT:  Objection, beyond the scope
2  of a voir dire.
3      Q.  BY MR. OSBORNE:  Is there anything in
4  this document that you disagree with?
5      A.  No, at that time I didn't.
6          MR. OSBORNE:  We have no objection.
7          MR. SILVERT:  So I move it into evidence.
8          MR. OSBORNE:  Yes.
9
10         EXAMINATION (cont'd)
11  BY MR. SILVERT:
12     Q.  Did there come a time where you filed a
13  lawsuit against Katherine Kealoha?
14     A.  Yes, I did.
15     Q.  Do you remember about when you filed that
16  lawsuit?
17         MR. OSBORNE:  Objection to any testimony
18  about any lawsuit, it is totally irrelevant.
19     Q.  BY MR. SILVERT:  You can answer the
20  question.
21         Do you remember when you filed the
22  lawsuit?
23     A.  It was, I think, in June 2009.  It was in
24  2009.  Not '09, I'm sorry, 2013, I think it was.
25     Q.  Okay.  What was the lawsuit about?

Page 21

1          MR. OSBORNE:  Objection.
2          Counsel, just to speed things up --
3          MR. SILVERT:  You have a running
4  objection.
5          MR. OSBORNE:  May I have a running
6  objection to any question concerning any lawsuit.
7      Q.  BY MR. SILVERT:  In general --
8          MR. OSBORNE:  "Yes" for that?
9          MR. SILVERT:  I understand.
10     Q.  In general, what is that lawsuit about?
11     A.  I was suing her for all the money she
12  spent.  She had gotten joint accounts.
13     Q.  And the joint account was with you?
14     A.  Yes, and I didn't know anything about it.
15     Q.  In the lawsuit did you say that she took
16  the money improperly from you?
17     A.  Yes.
18     Q.  I'm showing you what's been marked as
19  Defense Exhibit C.
20         (Exhibit C was marked for
21  identification.)
22     Q.  BY MR. SILVERT:  Do you recognize that
23  document?
24     A.  Yes, I do.
25     Q.  What is that document?

Page 22

1      A.   That's the document suing Kathy for all
2   the money she took from me and without my
3   permission.
4      Q.   Is your son, Gerard Puana, part of that
5   lawsuit?
6      A.   Yes, he is.
7      Q.   So is it that you and Gerard Puana are
8   suing Katherine Kealoha?
9      A.   Yes, we are.
10     Q.   Is that lawsuit still pending?
11     A.   Yes, it is.
12     Q.   And do you have an attorney that
13  represents you in that case?
14     A.   Yes.
15     Q.   And what's his name?
16     A.   His name is Gerald Kurashima.
17         MR. SILVERT:  I would move Exhibit C into
18  evidence.
19         MR. OSBORNE:  And I'd ask to voir dire.
20
21         VOIR DIRE EXAMINATION
22  BY MR. OSBORNE:
23     Q.   Who was it who decided to retain
24  Mr. Kurashima?
25         MR. SILVERT:  I would object on the basis

Page 23

1   that this isn't proper voir dire.
2      Q.   BY MR. OSBORNE:  Who was it who decided
3   to retain Mr. Kurashima?
4      A.   Well, after I said she was no longer my
5   attorney, I had Rick Hartsell be my attorney, the
6   one that had the power of attorney.
7      Q.   But who chose Mr. Gerald Kurashima to be
8   your attorney?
9      A.   Mr. Yano, Francis Yano, did.
10     Q.   Did you ask Mr. Yano to get you an
11  attorney?
12         MR. SILVERT:  I would just have a running
13  objection to all these questions.
14     Q.   BY MR. OSBORNE:  Did you ask Mr. Yano to
15  get you an attorney?
16     A.   Yes.
17     Q.   Did you tell Mr. Yano why you wanted an
18  attorney?
19     A.   Yes.
20     Q.   Mr. Yano is a lawyer, is he not?
21     A.   He is a lawyer, but he also -- he is
22  semiretired, and he said that --
23     Q.   You can't say what he said, thank you,
24  ma'am.
25     A.   Okay.

Page 24

1      Q.   Did you meet with Mr. Kurashima to tell
2   him about the basis of your lawsuit, the reasons
3   why you wanted to sue?
4      A.   Well, he had all the papers.
5      Q.   Did you meet with him to discuss those
6   papers and why you wanted to sue?
7      A.   Yes, I did.
8      Q.   Was your son present?
9      A.   Yes, he was.
10     Q.   Had your son, in fact, selected
11  Mr. Kurashima?
12     A.   He didn't know who he was.  Francis Yano
13  told us where to go, and we went.
14     Q.   So Mr. Yano told both you and your son.
15     A.   Yes.
16     Q.   And you and your son went together.
17     A.   Yes, we did.
18     Q.   Without telling me what they said, who
19  spoke the most about what the lawsuit was for?
20         MR. SILVERT:  And a continuing objection
21  to all of these questions.
22         MR. OSBORNE:  You can answer.
23         THE WITNESS:  Can you repeat it, please.
24     Q.   BY MR. OSBORNE:  Sure.  Which of you
25  spoke to Mr. -- which is you and your son -- spoke

Page 25

1   the most to Mr. Kurashima about what the lawsuit
2   was to be about?
3      A.   My son and I.
4      Q.   You primarily listened to what was going
5   on; is that right?
6      A.   Yes, I did.
7      Q.   And it was your son who primarily
8   conveyed the information to the lawyer.
9      A.   No, he didn't.  I asked him to go with me
10  because I don't drive anymore.
11     Q.   Well, I think you told me that your son
12  did most of the talking.  Is that true?
13     A.   I don't remember saying that.
14     Q.   Who did the most talking, you or your
15  son?
16     A.   We were both there, and we answered all
17  the questions he wanted to know.
18         MR. OSBORNE:  I'm done.
19         MR. SILVERT:  I would move Exhibit C into
20  evidence.
21         MR. OSBORNE:  Objection on relevancy
22  grounds.
23
24
25

Page 26

```
1              EXAMINATION (cont'd)
2   BY MR. SILVERT:
3       Q.   Did there come a time when you wrote a
4   letter to Katherine Kealoha?
5       A.   Yes, I did.
6            THE VIDEOGRAPHER:  Your mic is off.
7       Q.   BY MR. SILVERT:  I'll repeat the
8   question.  Did there come a time when you wrote a
9   letter to Katherine Kealoha?
10      A.   Yes, I did.
11      Q.   And was that to take away the power of
12  attorney that you had given her?
13      A.   Yes.
14      Q.   I'm showing you what's been marked as
15  Defense Exhibit A.
16           (Exhibit A was marked for
17  identification.)
18      Q.   BY MR. SILVERT:  Do you recognize that
19  letter?
20      A.   Yes, I do.
21      Q.   And is there a signature at the bottom of
22  the letter?
23      A.   Yes, there is.
24      Q.   Whose signature is that?
25      A.   That's my signature.
```

Page 27

```
1       Q.   Is that the letter that you wrote to
2   Katherine Kealoha to take away her power of
3   attorney?
4       A.   Yes, it is.
5       Q.   Did you write that letter?
6       A.   No, my daughter Kay Hartsell wrote it for
7   me because I just told her what to write, and I
8   read it, and I approved it, and I signed it.
9       Q.   When you say your daughter, Kay Hartsell,
10  what's her full name?
11      A.   Her name is Florence Kehaulani Mau, and
12  it's Hartsell.
13      Q.   And why do you call her Kay?
14      A.   It was a name that we all called her, a
15  nickname, we all called her Kay.
16      Q.   Is that what the family calls her?
17      A.   Yes, we all call her Kay.
18      Q.   So she typed the letter?
19      A.   Yes, she did.
20      Q.   But you read it and signed it.
21      A.   Yes.
22      Q.   And was that letter sent to Katherine
23  Kealoha?
24      A.   Yes.  And Louis Kealoha.  And Yano signed
25  it.
```

Page 28

```
1       Q.   What is the date of that letter?
2       A.   Date of that letter is September the
3   10th, 2012.
4       Q.   Does that letter spell out why you were
5   taking away the power of attorney you had given her
6   before?
7       A.   Yes, because we waited so long, and we
8   didn't have any statements of the mortgage, we
9   didn't receive any papers at all.
10           MR. SILVERT:  I would move to introduce
11  Defense Exhibit A into evidence.
12           MR. OSBORNE:  Just a couple voir dire
13  questions.
14
15           VOIR DIRE EXAMINATION
16  BY MR. OSBORNE:
17      Q.   Why did you choose Ms. Hartsell to write
18  this letter?
19      A.   She's my daughter.
20      Q.   Did you give her the wording of the
21  letter or --
22      A.   No, she did, because, like I said, I just
23  told her, in words, what I really wanted in the
24  letter, and she wrote it, and I read it, and I
25  approved it.
```

Page 29

```
1       Q.   Whose idea was it to send a copy of the
2   letter to Louis Kealoha?
3            MR. SILVERT:  And I would object as
4   improper voir dire.
5       Q.   BY MR. OSBORNE:  Whose idea was it to
6   send a letter to Louis Kealoha?
7       A.   My son-in-law, Rick, which I appointed
8   him to be my attorney, and they took it over, and
9   he got it.
10      Q.   Do you know why you sent a copy of this
11  letter to the chief?
12           MR. SILVERT:  Again, I would state a
13  continuing objection.
14           THE WITNESS:  Yes.
15      Q.   BY MR. OSBORNE:  Why?
16      A.   Because, like I said, I waited so long, I
17  didn't have any documents or no papers.  And any
18  time I would call her there was only a strumming of
19  a ukulele, that's all it was, so I couldn't get
20  ahold of her at any time.
21      Q.   So if I understand you, you sent it to
22  the chief because you thought this would get it to
23  his wife.
24      A.   Yes, because I didn't know if she
25  would --
```

1    Q.   Was that your idea, to send it to the
2  chief?
3    A.   Yes.
4    Q.   You weren't told that by anyone else.
5    A.   No.
6        MR. OSBORNE:  I'm done.
7        MR. SILVERT:  I would move Defense
8  Exhibit A into evidence.
9        MR. OSBORNE:  Again, object on relevance
10  grounds.
11
12        EXAMINATION (cont'd)
13  BY MR. SILVERT:
14    Q.   Did there come a time when you were
15  trying to get your bank statements from the Bank of
16  Hawaii?
17    A.   Yes.
18    Q.   And that was the bank account that you
19  had with Katherine Kealoha.
20    A.   Yes.
21    Q.   To do this reverse mortgage.
22    A.   Yes.
23    Q.   Why did you want to get the bank
24  statement?
25    A.   Because I didn't know how much she spent,

1  and I wanted to know exactly because I signed the
2  paper, she told me to sign the paper, she took me
3  to Bank of Hawaii and, like I said, I just had
4  eighth grade education, so I don't understand small
5  print, so I told my son-in-law to go to the bank.
6  First my son and I went to the bank.
7    Q.   Let me just break this up.
8        Did there come a time you wrote a letter
9  to the bank trying to get your statements?
10    A.   Yes.
11    Q.   I'm showing you Defense Exhibit D.
12        (Exhibit D was marked for
13  identification.)
14    Q.   BY MR. SILVERT:  Can you look at Defense
15  Exhibit D.  Do you recognize that letter?
16    A.   Yes, I do.
17    Q.   Is there a signature on that letter?
18    A.   My signature.
19        MR. OSBORNE:  We object to any testimony
20  about the letter on the relevance grounds.
21    Q.   BY MR. SILVERT:  Did you write that
22  letter?
23    A.   No, I did not.
24    Q.   Who wrote the letter?
25    A.   My daughter, Kay Hartsell.

1    Q.   And her full name again is, your
2  daughter's full name?
3    A.   Florence Kehaulani.  At that time it was
4  Hartsell.
5    Q.   And what was the process, is this the
6  same process where you told her what to write?
7    A.   Yes.
8    Q.   And then she typed it.
9    A.   Yes.
10    Q.   Did you read it?
11    A.   Yes, I read it, and I approved it, and I
12  signed it.
13    Q.   What is the date on that letter?
14    A.   The date on this letter was January 29th,
15  2013.
16        MR. SILVERT:  I would move to introduce
17  Exhibit D into evidence.
18        MR. OSBORNE:  And I'd like to voir dire.
19
20        VOIR DIRE EXAMINATION
21  BY MR. OSBORNE:
22    Q.   Was your son, Mr. Puana, the gentleman
23  seated here, was he involved in the writing of this
24  letter?
25        MR. SILVERT:  Again, I would object on

1  improper voir dire.
2    Q.   BY MR. OSBORNE:  "Yes" or "no?"
3    A.   I was.
4    Q.   Was he present, your son?
5    A.   He was not present, but I am the owner of
6  my house.
7    Q.   I know that.
8    A.   Yes.
9    Q.   But was your son present when you met
10  with Mrs. Hartsell, at that time, to write this
11  letter?
12    A.   Yes, she was at my house when she wrote
13  it.
14    Q.   He lives in your house, doesn't he?
15    A.   No, she does not.
16    Q.   Doesn't she live there now?
17    A.   No, she does not.
18    Q.   No, your son.  Doesn't your son --
19    A.   My son lives downstairs, and I live
20  upstairs.
21    Q.   Right, and he lived there at the time of
22  the writing of this letter.
23    A.   Yes.
24    Q.   And he was in the meeting when the letter
25  was written.

Page 34

1    A.  He was, with my daughter and I upstairs,
2  yes.
3    Q.  And he had comments to make about the
4  contents of the letter, didn't he?
5    A.  Well, it was all true.
6    Q.  He had comments to make about the
7  contents of the letter and what should be in it,
8  didn't he?
9    A.  Well, that's right.  He told her -- he
10  read the letter after she wrote it, and, like me, I
11  was happy with it so I signed it.
12    Q.  And he talked about the letter before it
13  was written, didn't he, at that meeting.
14    A.  No, he did not talk about the letter.
15    Q.  He did not give her any information?
16    A.  He did not.  She wrote it on her own
17  because I told her what to write.
18    MR. OSBORNE:  No further questions.
19    MR. SILVERT:  I move Defense Exhibit D
20  into evidence.
21    MR. OSBORNE:  We object on its relevance
22  grounds and also the authorship.
23    MR. SILVERT:  I think I just moved
24  Exhibit D into evidence, right?
25    MR. OSBORNE:  Yeah, and I object.

Page 35

1            EXAMINATION (cont'd)
2  BY MR. SILVERT:
3    Q.  You talked about that you gave
4  Mr. Hartsell the power of attorney, correct?
5    A.  Yes.
6    Q.  Who is he?
7    A.  He is my son-in-law, married to Florence
8  Kehaulani Hartsell.
9    Q.  Did he also, to your knowledge, attempt
10  to get your bank statements from the Bank of
11  Hawaii?
12    A.  Yes, he did.
13    Q.  Did he get them?
14    A.  No, they said they won't accept any power
15  of attorney.
16    Q.  Did you eventually get the bank
17  statements?
18    A.  Yes, I did.
19    Q.  Can you tell me how you got them.
20    A.  After calling the bank, they refused to
21  give the paper, and then finally --
22    MR. OSBORNE:  I'm going to object now,
23  I'm going to move to strike the statement of what
24  the bank allegedly told Mr. Hartsell, as being
25  hearsay, and I'm going to object to anything on the

Page 36

1  present question that this unidentified
2  representative of the bank is alleged to have said
3  as hearsay.
4    Q.  BY MR. SILVERT:  You can go ahead and
5  answer the question.
6    So what happened when you tried to get
7  the records?
8    A.  Well, my son called the bank, and finally
9  the manager told my son to go on Monday, this is
10  Friday he called me, and when we did go to the bank
11  the manager told us that --
12    MR. OSBORNE:  Again, objecting to what
13  third parties told you.
14    Q.  BY MR. SILVERT:  You can go ahead, keep
15  going.
16    A.  And he said to come on Monday, which we
17  did, my son and I went to the bank, and he finally
18  gave the bank statements to us.
19    Q.  Did you have to pay for copies of the
20  bank record?
21    A.  Yes.
22    MR. OSBORNE:  Objection, relevancy.
23    THE WITNESS:  He said we would have to
24  have $240 to get the bank statements.
25    Q.  BY MR. SILVERT:  And did you get the

Page 37

1  money and pay for that?
2    A.  So my son and I went to get the money, we
3  brought it back to him, and he finally gave it to
4  us.
5    Q.  Do you remember about when that happened?
6    A.  That happened in March, no, February of
7  2013.
8    Q.  Was that a few days after you wrote the
9  letter?
10    A.  Yes, it was maybe six days after we wrote
11  the letter.
12    Q.  I want to talk about a deposition hearing
13  that you attended with Katherine Kealoha.  Do you
14  remember that?
15    A.  Yes, I do.
16    Q.  Who was present at that deposition
17  hearing?
18    A.  It was Katherine, her attorney, my
19  son, Gerry, and I, and there was someone like her
20  typing.
21    Q.  When you say the word "Gerry," are you
22  referring to your son Gerard, that is Gerry, what
23  you call Gerard?
24    A.  Yes.
25    Q.  So when you've been talking about your

Page 38

1    son, Gerry, you've been talking about Mr. Gerard
2    Puana?
3        A.   Yes.
4        Q.   Did there come a time when you left the
5    deposition hearing?
6        A.   Yes, I did.
7        Q.   Did you stay for the whole hearing or did
8    you leave early?
9        A.   No, because my hip was hurting, and my
10   wrist, I fractured my wrist, too, and it was
11   hurting, and I was so tired, so I left.
12       Q.   So you left early.
13       A.   Maybe ten minutes early.
14       Q.   When you left, who went with you?
15       A.   My son and I left.
16       Q.   When you say "your son," who are you --
17       A.   Gerard and I left.
18       Q.   And where did you go?
19       A.   We went back down the lobby, and I sat in
20   the lobby, and my son told me:  Mom, sit with
21   Bobby.
22       Q.   Who is Bobby?
23       A.   Bobby is the husband of my
24   great-granddaughter, Maili Louise, who is Kathy's
25   niece.

Page 39

1        Q.   So is Bobby the person you identified
2    earlier at Bobby Nguyen.
3        A.   Yes.
4        Q.   The police officer.
5        A.   Yes.
6        Q.   That day, was he wearing a police
7    uniform?
8        A.   No, he wasn't.
9        Q.   When you sat down next to him, what was
10   Bobby doing?
11       A.   He was on the phone.
12       Q.   Where did your son, Gerard, go?
13       A.   My son, Gerard, told me:  Sit next to
14   Bobby and wait for me.  He went to get the car,
15   because I didn't know he parked, but he went to get
16   the car.
17       Q.   How long was your son, Gerard, gone
18   before he came back?
19       A.   About 15 minutes.
20       Q.   And during the time you sat on the sofa
21   with Bobby, did you have a conversation with Bobby?
22       A.   Well, he asked me --
23            MR. OSBORNE:  Objection, hearsay.
24       Q.   BY MR. SILVERT:  Go ahead.
25       A.   He asked me what kind of car did my son

Page 40

1    drive, and I said:  White.
2        Q.   And did he say anything else to you?
3        A.   And then he said:  Where did he park?
4    And I said:  I don't know.
5        Q.   During all of the other time, the
6    15 minutes you sat with Bobby, did he say anything
7    else to you?
8        A.   No, he didn't.
9        Q.   What was he doing?
10       A.   He was on the phone.
11       Q.   When Gerard came back, your son, to get
12   you, did Bobby help you get up?
13       A.   No, he didn't.
14       Q.   Did he walk you to the car?
15       A.   No, he didn't.
16            MR. OSBORNE:  Relevance.
17       Q.   BY MR. SILVERT:  Did he do anything to
18   help you to get to the car?
19       A.   No, he didn't.
20       Q.   When you said to Bobby that your son
21   drove a white car, was that correct?
22       A.   Well, it's a silver car, but I said
23   white.
24       Q.   So you were wrong.
25       A.   Yes, I was wrong.

Page 41

1        Q.   Now, in this case you saw some videos of
2    a person taking a mailbox; is that right?
3        A.   Yes, I did.
4        Q.   How many times have you watched those
5    videos?
6        A.   Four times.
7        Q.   And what do those videos, in general,
8    show?
9        A.   Showed the car driving close to a home on
10   the street, and he parked by the mailbox and took
11   the mailbox, he walked around the car, put it in
12   the car, and he drove off.
13       Q.   Do you recognize the person in that
14   video?
15       A.   No, I didn't recognize him.
16       Q.   Is that your son, Gerard, in the video?
17       A.   No, it is not my son.
18       Q.   Why do you think it's not him?
19       A.   Because --
20            MR. OSBORNE:  Objection, relevance.
21            THE WITNESS:  He was -- first of all, he
22   was younger.
23       Q.   BY MR. SILVERT:  When you say "he," the
24   person in the video?
25       A.   The person in the video was younger, and

11 (Pages 38 to 41)

Page 42

```
 1   he didn't have my son's build.
 2        Q.  And when you say that, it's from your
 3   perception of what he looked like in the video.
 4        A.  Yes.
 5            MR. SILVERT:  Thank you.  I have nothing
 6   further.
 7
 8            EXAMINATION
 9   BY MR. OSBORNE:
10        Q.  Now, as I understand your testimony here
11   today, and please correct me if I'm wrong, your son
12   was interested in buying a condominium; is that
13   right?
14        A.  I was.  Because he lived with me, he took
15   care of me after my husband died, and I wanted to
16   do that.  Because when he was married he lived in
17   this condominium and he loved it, but he divorced.
18   And after that, his friend, his friend that knew
19   that he wanted to buy there.  So I really -- when
20   it came up and the price, I figured that I would
21   use the money from the mortgage, reverse mortgage,
22   and buy the condominium, for my son.
23        Q.  Now, how many children do you have,
24   total?
25        A.  Nine.
```

Page 43

```
 1        Q.  Congratulations.
 2            You said Mr. Puana is the youngest boy.
 3        A.  Yes.
 4        Q.  Where does he come in the whole line of
 5   nine, is he third, the fifth?
 6        A.  He is my youngest son.
 7        Q.  I know, but what number child, is he the
 8   last, is he the fifth?
 9        A.  He's the last.
10        Q.  Oh, so he's your --
11        A.  He's the youngest.
12        Q.  Of all the children.
13        A.  Yes.
14        Q.  Not only your youngest son, he's the baby
15   of the family.
16        A.  Yes.
17        Q.  Did you discuss your getting this
18   condominium with any of the other children?
19        A.  No, I didn't.
20        Q.  So this was a special favor that you were
21   doing for your son, and it was something that was
22   between you and Mr. Puana.
23        A.  Yes, because --
24        Q.  He had helped you so much; is that right?
25        A.  Pardon?
```

Page 44

```
 1        Q.  You did it because he had helped you so
 2   much.
 3        A.  Yes.
 4        Q.  And, in fact, the condominium in this
 5   case eventually was lost; is that right?
 6        A.  No, it's not lost because she, Katherine
 7   Kealoha, paid for the condominium, and she used the
 8   rest of the money.
 9        Q.  Do you still own that condominium?
10        A.  Yes, I do, it's in my name, but my son
11   lives there because after I sold my house he didn't
12   have anywhere to go.
13        Q.  Does your son still live there?
14        A.  Yes, he does.
15        Q.  So you got what you wanted, the
16   condominium; is that right?
17        A.  But I wanted my home, too.
18        Q.  And in order to get the condominium, the
19   house was foreclosed upon because you had a reverse
20   mortgage; is that right?
21        A.  My house, yes.
22        Q.  Yes.
23            Where do you live now?
24        A.  I live in Kailua, because I fractured my
25   hip on April the 3rd of last year.
```

Page 45

```
 1        Q.  Oh, I'm sorry to hear that, but we don't
 2   really need to go into that, I was just wanting to
 3   know where you lived.
 4        A.  I didn't have anywhere to go, so my
 5   daughter and my son-in-law said to go with them, so
 6   I've been there.
 7        Q.  When your house was lost, when they
 8   foreclosed on the reverse mortgage, did you discuss
 9   that with your other children?
10        A.  Yes, I did.
11        Q.  And that's when they found out that you
12   had purchased this condominium; is that right?
13        A.  Yes.  Because.
14        Q.  I'm sorry, ma'am, you were going --
15        A.  I'm just answering your questions "yes"
16   or "no."
17        Q.  And you have answered it, is that right,
18   or is there more to say?
19        A.  No.
20        Q.  I got that "because," and I was wondering
21   what was coming after that, so thank you.
22            Mrs. Kealoha, she's your daughter's
23   child --
24        A.  My son's.
25        Q.  Your son's, okay, I'm sorry.
```

12 (Pages 42 to 45)

Page 46

1       A.   My son's daughter.
2       Q.   Mrs. Kealoha is your son's daughter.
3       A.   Yes.
4       Q.   I got it.  And which son is that?
5       A.   Rudy Puana.
6       Q.   So Mr. Puana, seated here, and
7  Mrs. Kealoha are uncle and niece.
8       A.   Yes, niece and nephew.
9       Q.   If you just give me a second.
10           Who actually mailed the termination of
11  Mrs. Kealoha as the power of attorney, who put
12  those letters in the mail, the one that was
13  addressed to -- let me see if I can find the exact
14  one, Exhibit A for the Defense, the letter dated
15  9-10-12, that is addressed to "Dear Katherine" with
16  copies to Louis Kealoha.
17           Who actually put those in the mail?
18       A.   Mr. Yano, the attorney, Francis Yano.
19       Q.   Do you know whether there was a letter
20  addressed to Mrs. Kealoha?
21       A.   I presume so because.
22       Q.   You didn't address the letters.
23       A.   No, I didn't.
24       Q.   You would have wanted one to go to her,
25  but you do not know of your own knowledge whether

Page 47

1  one went to her or not.
2       A.   Well, my son-in-law, who took over after
3  the months went by and the years went by, I didn't
4  have any answers, I couldn't call her.  I called
5  the mother, and she said she is too busy, she has
6  so much work to do.  She wouldn't get back to me,
7  and.
8       Q.   Are you telling me that Mrs. Kealoha's
9  mother told you that?
10       A.   Yes.
11       Q.   Over the telephone.
12       A.   Yes, she did.
13       Q.   When?
14       A.   Oh, it was -- because she told me, the
15  reason why I signed that paper to do a reverse
16  mortgage, was that the condominium at that time,
17  the price was very good, and she promised me that
18  the reverse --
19       Q.   Who is "she," I'm sorry?
20       A.   Katherine Kealoha promised me --
21       Q.   I'm not asking you about Katherine, I'm
22  not asking you about Katherine at all.  You
23  mentioned, if I have your testimony correct, you
24  said you could never reach Katherine on the
25  telephone, so you called your sister, her mother.

Page 48

1       A.   Yes, her mother is -- not mine, she is my
2  daughter-in-law.
3       Q.   Daughter-in-law.
4       A.   Yes.
5       Q.   You called your daughter-in-law.
6       A.   Yes.
7       Q.   And you said, in effect, why isn't
8  Katherine getting back to me, I've been trying, and
9  she told you she's too busy; is that right?
10       A.   I called the mother, and she told me -- I
11  said:  Please tell her daughter to please call me.
12       Q.   Now, when -- we've already gone over the
13  contents of the conversation.
14           When did you call this lady and tell her
15  that?
16       A.   Because I couldn't get ahold of the
17  daughter.
18       Q.   When?  Not why.  When?  The date.
19  Approximately when?
20       A.   Well, it was in 2000 -- I had that
21  reverse mortgage in 2009, and she told me,
22  Katherine Kealoha told me --
23       Q.   Now, I don't care what Katherine Kealoha
24  told you, I'm asking you when did you call your
25  daughter-in-law, Katherine's mother, and tell her

Page 49

1  to please have Katherine call you?
2       A.   Because --
3       Q.   No, not why.  When?  January, February,
4  March?  When?
5       A.   I don't know the year, but it was about
6  after the mortgage, reverse mortgage, it has been
7  about three years, almost four years that I waited.
8       Q.   Did you call the mother, your
9  daughter-in-law?
10       A.   Yes.
11       Q.   Did you call her at or about the time you
12  sent out Exhibit A, the letter?  It's right in
13  front of you.
14       A.   Well, it was 2012.  September 10th.
15       Q.   That's the letter date.  Now, what I'm
16  asking you is:  Was your effort to reach
17  Mrs. Kealoha through her mother, was that at about
18  the same time as the letter?
19       A.   Yes, about that time.
20       Q.   And that time, then, is -- and I don't
21  have the letter in front of me, that's in the
22  summer of 2010, is that right, that's the date
23  there.  The letter is dated September of 2012.
24           Throughout this arrangement concerning
25  the reverse mortgage on your house, it was your

Page 50

1  intention that all of that money be used to buy the
2  condominium.  That's correct, isn't it?
3      A.  I didn't know how much she spent, she
4  would spend, to buy the condominium.
5      Q.  What did you think was going to be done
6  with the money that you got on your reverse
7  mortgage?
8      A.  I told her --
9      Q.  Please use names because "her" is hard.
10     A.  I told Katherine Kealoha that -- she said
11 it would be more than three months that the house
12 will be purchased and my home, I could go back to
13 my home and live.
14     Q.  Well, you didn't have to leave your home
15 when you got the reverse mortgage, did you?
16     A.  Not right then because --
17     Q.  There was a time that the mortgage could
18 be paid for, right?
19     A.  Yes, but --
20     Q.  And do you know how long it was that you
21 had to repay the mortgage?
22     A.  I did not know any of that because she
23 took care of everything, that's why I wanted her to
24 be my attorney.
25     Q.  But how long between the time you got the

Page 51

1  reverse mortgage and the money went to your son to
2  buy the condominium, that you wanted him to have,
3  how long was it until the reverse mortgage was
4  foreclosed on and you had to leave the house?
5      A.  We got that 2009 and here it is 2014, so
6  it took all of this time, and I didn't have any
7  papers, I didn't have any --
8      Q.  No, I'm not worried about papers or
9  anything else.  You got a mortgage on the house.
10     A.  2009.
11     Q.  Did there ever come a time after 2009
12 that the bank ordered you to move out?
13     A.  It was 2009 and this is 2014.
14     Q.  So you're still not answering my
15 question.  You got the mortgage in 2009.
16     A.  Yes.
17     Q.  We all agree.  When did you have to move
18 out of the house because the mortgage wasn't being
19 paid?
20     A.  We moved, I guess, a year, about a year
21 ago we moved.
22     Q.  So 2013, probably, huh, sometime.
23     A.  Yes.
24     Q.  Now, where was the money supposed to come
25 from that was going to pay the reverse mortgage

Page 52

1  back?
2      A.  From my home, because that's all I owned,
3  my home.
4      Q.  So you expected that your home was going
5  to be repossessed by the bank?
6      A.  Yes, because it was, like I said, 2009 we
7  had the mortgage done.
8      Q.  Right.
9      A.  Yes.
10     Q.  And you made no payments on the mortgage.
11     A.  How could I?
12     Q.  I'm not blaming anybody.
13         You made no payments on the mortgage,
14 right?
15     A.  No, I didn't.
16     Q.  And the money was used, if your wishes
17 had been followed, the money would have been used
18 to buy your son's condominium; is that right?
19     A.  Yes.
20     Q.  And did you ever receive any money back
21 from your son?
22     A.  What money?
23     Q.  Any.  Did he give you money for the
24 mortgage on the house?
25     A.  We didn't have any papers, we didn't know

Page 53

1  what was going on.
2      Q.  I'm not asking you about papers.  You
3  know that you had to make payment, you didn't know
4  how much, perhaps, but you knew you had to make a
5  payment.
6      A.  Yes.
7      Q.  Did your son ever give you any money to
8  make the payment?
9      A.  He paid Kathy Kealoha.
10     Q.  How do you know that?
11     A.  Because he told me --
12     Q.  Hearsay, I move to strike.
13         MR. SILVERT:  I object.  You asked a
14 question.
15         MR. OSBORNE:  Didn't know she was going
16 to say hearsay.
17     Q.  But in any event, you can't talk about
18 what other people said.
19         You never got any money to send to the
20 bank, did you?
21     A.  No, I didn't.
22     Q.  And your son still lives in the
23 condominium?
24     A.  He does because he has nowhere else.
25     Q.  Okay.  He still lives in the condominium.

14 (Pages 50 to 53)

Page 54

1    A.   Yes, but I own it.
2    Q.   You own it.
3    A.   Yes.
4    Q.   Okay.  So all the money that went into
5  the condominium has secured for you a condominium
6  you still own today.
7    A.   Yes, I do.  But -- well.
8         MR. OSBORNE:  I have no further
9  questions.
10        MR. SILVERT:  Just a few follow-up
11  questions.
12
13        FURTHER EXAMINATION
14  BY MR. SILVERT:
15    Q.   You trusted Katherine Kealoha to take
16  care of all of the paperwork regarding the reverse
17  mortgage.
18    A.   Yes, I did.
19    Q.   You don't understand that paperwork, did
20  you?
21    A.   No.
22    Q.   And you didn't understand how much was to
23  be paid.
24    A.   No, I didn't know.
25    Q.   She was going to take care of everything.

Page 55

1    A.   She said, she promised me not to worry.
2  At first my son didn't write, sign that paper for
3  the mortgage, I did, because he said he has eight
4  other siblings that he has to think about.
5    Q.   But my point is that, at your age and
6  your knowledge, you had no idea what was happening
7  with the paperwork --
8    A.   No.
9    Q.   Katherine Kealoha was doing it all.
10    A.   Yes.
11    Q.   And as a result of what happened, you
12  lost your house.
13    A.   Yes.
14    Q.   And you've sued her for that.
15    A.   Yes.
16    Q.   And she took money, is this correct, that
17  she took money from the bank account --
18        MR. OSBORNE:  Objection, leading.
19        MR. SILVERT:  Okay.  No further
20  questions.
21
22        FURTHER EXAMINATION
23  BY MR. OSBORNE:
24    Q.   You knew that if you got a mortgage, a
25  reverse mortgage on your home, it had to be paid

Page 56

1  back.
2    A.   Yes, I did.
3    Q.   And you know it was never paid back;
4  isn't that right?
5    A.   (No audible response.)
6    Q.   Do you know it was never paid back?
7    A.   Must have been because I lost it.  She
8  took care of everything.
9        MR. OSBORNE:  No further questions.
10        MR. SILVERT:  No questions.
11        Read and sign.
12        (The deposition concluded at 11:05 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 57

1        SIGNATURE OF THE WITNESS
2        I, FLORENCE PUANA, the witness in the above
3  deposition, do hereby certify that I have read the
4  foregoing deposition, taken on August 21, 2014, and
5  that the said deposition is a true and correct
6  record of my testimony, with such corrections and
7  changes, if necessary, attached.
8
9
10  _____    _____
11  FLORENCE PUANA                Date
12
13
14
15
16
17
18
19
20
21
22
23  Case:    United States of America vs. Puana
       Case No:  13-00735 LEK
24  Date:    8-21-14
       Taken by: Rita King
25

15 (Pages 54 to 57)

Page 58

```
1    STATE OF HAWAII    )
                        ) ss.
2    COUNTY OF HONOLULU )
3         BE IT KNOWN that the foregoing deposition
4    was taken before me, RITA KING, a Certified
5    Shorthand Reporter for the State of Hawaii; that
6    the witness before testifying was duly sworn by me
7    to testify to the whole truth; that the questions
8    propounded to the witness and the answers of the
9    witness thereto were taken down by me in shorthand
10   and thereafter reduced to print by computer-aided
11   transcription under my direction; that the witness
12   elected to read and sign; that the foregoing pages
13   are a full, true and accurate transcript of all
14   proceedings and testimony had and adduced upon the
15   taking of said deposition, all done to the best of
16   my skill and ability.
17        I FURTHER CERTIFY that I am in no way
18   related to nor employed by any of the parties
19   hereto nor am I in any way interested in the
20   outcome hereof.
21        DATED at Honolulu, Hawaii, this 2nd day of
22   September, 2014.
23
24        _____
25             RITA KING, RPR, CSR No. 373
```

16 (Page 58)

| A | | | | |
|---|---|---|---|---|
| ability 8:2,11,18 58:16 | anyone 30:4 | behalf 1:15 10:22 11:5 | choose 28:17 | 34:1 45:5 46:1,2 |
| about 12:20 13:5,13 | anything 9:2 19:24 | being 35:24 51:18 | chose 17:11 23:7 | 48:11,17 |
| 14:8,11 15:7 16:24 | 20:3 21:14 35:25 | best 58:15 | Church 7:3,7 | daughter's 5:4 32:2 |
| 16:25 17:7,21,23 | 40:2,6,17 51:9 | between 43:22 50:25 | cleaning 7:5 | 45:22 |
| 18:5 20:15,18,25 | anywhere 44:12 45:4 | beyond 15:2 20:1 | close 41:9 | daughter-in-law 48:2,3 |
| 21:10,14 24:2,19 | aortic 7:18 8:14 | birth 4:15 | come 10:20 20:12 26:3 | 48:5,25 49:9 |
| 25:1,2 31:20 34:3,6 | APPEARING 2:1 | Bishop 2:14 | 26:8 30:14 31:8 | day 18:1 39:6 58:21 |
| 34:12,14 35:3 37:5 | appointed 29:7 | blaming 52:12 | 36:16 38:4 43:4 | days 37:8,10 |
| 37:12,25 38:1 39:19 | approved 27:8 28:25 | Bobby 10:3 38:21,22 | 51:11,24 | Dear 46:15 |
| 47:21,22 49:5,7,11 | 32:11 | 38:23 39:1,2,10,14 | coming 45:21 | December 6:19 |
| 49:17,19 51:8,20 | Approximately 48:19 | 39:21,21 40:6,12,20 | commencing 1:16 | decided 13:17 22:23 |
| 53:2,17 55:4 | April 44:25 | bones 8:7 | comments 34:3,6 | 23:2 |
| above 57:2 | around 41:11 | born 4:19,20 | Complaint 3:22 | decision 14:21 |
| accept 35:14 | arrangement 49:24 | both 24:14 25:16 | computer-aided 58:10 | Defendant 1:7 2:7 |
| accomplish 19:22 | asked 12:19 25:9 39:22 | bottom 26:21 | concerning 21:6 49:24 | Defender 2:9 |
| account 21:13 30:18 | 39:25 53:13 | Boulevard 1:18 2:5,10 | concluded 56:12 | Defense 11:13 21:19 |
| 55:17 | asking 13:3 47:21,22 | boy 43:2 | condominium 11:1 | 26:15 28:11 30:7 |
| accounts 21:12 | 48:24 49:16 53:2 | break 31:7 | 13:25 18:5,7 42:12 | 31:11,14 34:19 46:14 |
| accurate 58:13 | Assistant 2:9 | brought 37:3 | 42:17,22 43:18 44:4 | deposition 1:13 3:19 |
| act 10:21 11:5 12:1 | attached 57:7 | build 42:1 | 44:7,9,16,18 45:12 | 37:12,16 38:5 56:12 |
| actually 18:14 46:10,17 | attempt 35:9 | Building 1:17 2:4,9 | 47:16 50:2,4 51:2 | 57:3,4,5 58:3,15 |
| address 46:22 | attended 37:13 | busy 47:5 48:9 | 52:18 53:23,25 54:5 | Description 3:19 |
| addressed 46:13,15,20 | attorney 2:4 3:21 10:21 | buy 11:1 13:24 42:19 | 54:5 | died 42:15 |
| adduced 58:14 | 12:2,12,21 13:20,21 | 42:22 50:1,4 51:2 | confused 19:9 | different 17:21 |
| affect 8:2,10,18 | 14:6,9,16,24,25 15:5 | 52:18 | Congratulations 43:1 | dire 3:5,7,9,11 12:6,9 |
| after 5:10 6:2,5,8 13:1 | 16:5,18 17:3,4,5,6 | buying 42:12 | contact 12:15,18 | 13:9 15:3 20:2 22:19 |
| 13:16 14:12 17:3 | 18:11,12,15,18,20 | | contacted 13:6 | 22:21 23:1 28:12,15 |
| 23:4 34:10 35:20 | 22:12 23:5,5,6,8,11 | C | contents 34:4,7 48:13 | 29:4 32:18,20 33:1 |
| 37:8,10 42:15,18 | 23:15,18 26:12 27:3 | C 3:22 21:19,20 22:17 | continuing 24:20 29:13 | direction 58:11 |
| 44:11 45:21 47:2 | 28:5 29:8 35:4,15 | 25:19 | cont'd 3:6,8,10,12 | disagree 19:25 20:4 |
| 49:6 51:11 | 37:18 46:11,18 50:24 | call 27:13,17 29:18 | 20:10 26:1 30:12 | discuss 24:5 43:17 45:8 |
| again 29:12 30:9 32:1 | Attorney's 1:17 | 37:23 47:4 48:11,14 | 35:1 | discussed 19:18 |
| 32:25 36:12 | audible 56:5 | 48:24 49:1,8,11 | conversation 39:21 | DISTRICT 1:1,2 |
| against 20:13 | August 1:15 4:16 57:4 | called 27:14,15 36:8,10 | 48:13 | divorced 42:17 |
| age 55:5 | authorship 34:22 | 47:4,25 48:5,10 | conveyed 25:8 | document 11:7,10,17 |
| ago 51:21 | away 26:11 27:2 28:5 | calling 19:5 35:20 | copies 36:19 46:16 | 11:17,19,25 12:3,11 |
| agree 51:17 | a.m 1:16 56:12 | calls 27:16 | copy 29:1,1,10 | 12:24 13:5,14 16:19 |
| ahead 36:4,14 39:24 | | came 5:10 6:17,19,21 | correct 15:6,12 35:4 | 16:23 17:13,20,21,23 |
| ahold 29:20 48:16 | B | 14:10 17:25 18:4 | 40:21 42:11 47:23 | 17:24,24 18:5,15 |
| Ala 1:17 2:5,10 | B 3:21 11:13,14 18:15 | 39:18 40:11 42:20 | 50:2 55:16 57:5 | 19:24 20:4 21:23,25 |
| Alan 2:13 | 19:7,8,16,25 | cannery 6:8 | corrections 57:6 | 22:1 |
| alert 9:8 | baby 43:14 | car 39:14,16,25 40:14 | counsel 2:1 19:11 21:2 | documents 29:17 |
| ALEXANDER 2:8 | back 17:22 19:12 37:3 | 40:18,21,22 41:9,11 | COUNTY 58:2 | doing 39:10 40:9 43:21 |
| alive 6:13 | 38:19 39:18 40:11 | 41:12 | couple 28:12 | 55:9 |
| alleged 36:2 | 47:6 48:8 50:12 52:1 | care 19:17 42:15 48:23 | court 1:1,19 13:11 | done 25:18 30:6 50:5 |
| allegedly 35:24 | 52:20 56:1,3,6 | 50:23 54:16,25 56:8 | CR 1:3 | 52:7 58:15 |
| almost 49:7 | bank 30:15,15,18,23 | case 22:13 41:1 44:5 | CSR 58:25 | down 38:19 39:9 58:9 |
| aloha 9:16 | 31:3,5,6,9 35:10,10 | 57:23,23 | | downstairs 33:19 |
| already 48:12 | 35:16,20,24 36:2,8 | Certified 1:19 2:14 | D | drafted 14:15 17:13 |
| America 1:3 57:23 | 36:10,17,18,20,24 | 58:4 | D 3:23 31:11,12,15 | 18:14,25 19:4 |
| answer 13:12 20:19 | 51:12 52:5 53:20 | certify 57:3 58:17 | 32:17 34:19,24 | drive 25:10 40:1 |
| 24:22 36:5 | 55:17 | changes 57:7 | date 4:15 28:1,2 32:13 | driving 41:9 |
| answered 25:16 45:17 | basis 22:25 24:2 | Charlotte 5:5 | 32:14 48:18 49:15,22 | drops 8:1,2 |
| answering 45:15 51:14 | before 1:19 6:18 11:19 | chief 29:11,22 30:2 | 57:11,24 | drove 40:21 41:12 |
| answers 47:4 58:8 | 12:24 13:5,14 14:12 | child 5:14 43:7 45:23 | dated 46:14 49:23 | drug 9:2 |
| anybody 52:12 | 14:13 16:17,20 19:18 | children 5:12,13 42:23 | 58:21 | duly 4:2 58:6 |
| anymore 25:10 | 28:6 34:12 39:18 | 43:12,18 45:8 | daughter 5:1 17:15 | Durable 3:21 |
| | 58:4,6 | cholesterol 8:24 | 27:6,9 28:19 31:25 | during 39:20 40:5 |

**E**

E 2:3
earlier 39:2
early 38:8,12,13
education 6:3 31:4
effect 48:7
effort 49:16
eight 55:3
eighth 6:1,2,5 31:4
elected 58:12
employed 58:18
ESQ 2:3,8
event 53:17
eventually 6:25 35:16
  44:5
ever 51:11 52:20 53:7
everything 50:23 54:25
  56:8
evidence 12:5 20:7
  22:18 25:20 28:11
  30:8 32:17 34:20,24
exact 46:13
exactly 31:1
Examination 3:4,5,6,7
  3:8,9,10,11,12,13,14
  3:15 4:5 12:9 20:10
  22:21 26:1 28:15
  30:12 32:20 35:1
  42:8 54:13 55:22
examined 4:3
Excuse 19:11
Exhibit 11:13,14 18:15
  19:5,7,16,25 21:19
  21:20 22:17 25:19
  26:15,16 28:11 30:8
  31:11,12,15 32:17
  34:19,24 46:14 49:12
Exhibits 3:17,19
expected 52:4
eye 7:25

**F**

fact 12:20 24:10 44:4
family 17:10 27:16
  43:15
far 5:25
favor 43:20
February 37:6 49:3
Federal 1:17 2:4,9,9
feel 7:13,14 9:8
fell 19:13
few 37:8 54:10
fields 6:7
fifth 43:5,8
figured 42:20
filed 20:12,15,21
finally 35:21 36:8,17
  37:3

find 46:13
fine 7:14
first 2:9 4:2 6:23 14:24
  31:6 41:21 55:2
Florence 1:13 3:3 4:1,8
  27:11 32:3 35:7 57:2
  57:11
followed 52:17
follows 4:3
follow-up 54:10
foreclosed 44:19 45:8
  51:4
foregoing 57:4 58:3,12
formal 6:3
found 45:11
four 41:6 49:7
fractured 38:10 44:24
Francis 14:25 17:6,7
  23:9 24:12 46:18
Friday 36:10
friend 42:18,18
from 21:16 22:2 30:15
  35:10 42:2,21 51:25
  52:2,21 55:17
front 49:13,21
full 27:10 32:1,2 58:13
further 3:14,15 34:18
  42:6 54:8,13 55:19
  55:22 56:9 58:17

**G**

gave 10:20 11:7,25
  35:3 36:18 37:3
general 21:7,10 41:7
gentleman 12:22 32:22
Gerald 1:6 12:14 22:16
  23:7
Gerard 5:14 9:10,18
  11:4 22:4,7 37:22,23
  38:1,17 39:12,13,17
  40:11 41:16
Gerry 15:7,10,14,15
  37:18,19,21,22 38:1
getting 43:17 48:8
give 28:20 34:15 35:21
  46:9 52:23 53:7
given 26:12 28:5
glaucoma 7:18,20,23
  7:25
go 5:20,25 7:23 9:1
  10:16 14:20,21,23
  16:14,15 24:13 25:9
  31:5 36:4,9,10,14
  38:18 39:12,24 44:12
  45:2,4,5 46:24 50:12
going 10:18 11:12 25:4
  35:22,23,25 36:15
  45:14 50:5 51:25

52:4 53:1,15 54:25
gone 39:17 48:12
good 47:17
gotten 21:12
grade 6:1,2,5 31:4
grandchildren 5:17,18
  5:19,19
granddaughter 9:22
  14:1,4 16:4,25 18:12
  18:22 19:1,15
granddaughter/lawyer
  19:4
Grandma 17:2
great 5:18
great-granddaughter
  38:24
great-granddaughter's
  10:6
great-great 5:19
grew 4:22
grounds 25:22 30:10
  31:20 34:22
grow 4:21
guess 13:10 51:20

**H**

Haleakala 4:22
happened 36:6 37:5,6
  55:11
happening 55:6
happy 34:11
Harbor 6:18,19
hard 50:9
hardening 8:14
Hartsell 17:15 23:5
  27:6,9,12 28:17
  31:25 32:4 33:10
  35:4,8,24
having 4:2 14:8 16:25
Hawaii 1:2,18,20 2:5
  2:10,15 5:6 30:16
  31:3 35:11 58:1,5,21
hear 15:9 45:1
hearing 37:12,17 38:5
  38:7
hearsay 14:19 15:2
  35:25 36:3 39:23
  53:12,16
heart 8:15
help 9:4 40:12,18
helped 43:24 44:1
her 9:23 10:25 11:5,8
  14:1,8,11 17:16
  18:11,13,20,21 19:23
  21:11 26:12 27:2,7
  27:10,11,13,14,15,16
  27:17 28:5,20,23
  29:18,20 32:1,6 34:9

34:15,16,17 37:18,19
  46:24 47:1,4,25 48:1
  48:11,14,25 49:11,17
  50:8,9,23 55:14
hereof 58:20
hereto 58:19
him 9:13 12:19 15:1,4
  16:2,3,8 17:10,11
  24:2,5 25:9 29:8 37:3
  39:9 41:15,18 51:2
hip 38:9 44:25
home 41:9 44:17 50:12
  50:13,14 52:2,3,4
  55:25
Honolulu 1:18 2:5,10
  2:15 5:10 58:2,21
house 11:1 14:10 18:4
  33:6,12,14 44:11,19
  44:21 45:7 49:25
  50:11 51:4,9,18
  52:24 55:12
housewife 6:24
huh 51:22
hurting 38:9,11
husband 6:13 9:23 10:6
  38:23 42:15

**I**

idea 12:15 29:1,5 30:1
  55:6
identification 11:15
  21:21 26:17 31:13
identified 9:18 39:1
identify 9:10
improper 15:19 29:4
  33:1
improperly 21:16
INDEX 3:1
information 18:17 25:8
  34:15
intention 50:1
interested 42:12 58:19
introduce 28:10 32:16
involved 32:23
ironing 7:5
irrelevant 20:18
issue 8:13

**J**

jail 10:17
January 13:2 32:14
  49:3
Jimmy 15:11
job 6:25
joint 21:12,13
JR 2:3
June 6:20 20:23
just 9:1,2 16:17,19 21:2

23:12 27:7 28:12,22
  31:3,7 34:23 45:2,15
  46:9 54:10

**K**

K 1:6
Kailua 5:1 44:24
Katherine 9:21 10:9,21
  12:1 14:5 18:3,16
  20:13 22:8 26:4,9
  27:2,22 30:19 37:13
  37:18 44:6 46:15
  47:20,21,22,24 48:8
  48:22,23 49:1 50:10
  54:15 55:9
Katherine's 48:25
Kathy 13:21 22:1 53:9
Kathy's 38:24
Kay 17:15 27:6,9,13,15
  27:17 31:25
Kealoha 9:21 10:1,9,21
  12:1 14:5 18:3,16
  20:13 22:8 26:4,9
  27:2,23,24 29:2,6
  30:19 37:13 44:7
  45:22 46:2,7,11,16
  46:20 47:20 48:22,23
  49:17 50:10 53:9
  54:15 55:9
Kealoha's 47:8
keep 36:14
Kehaulani 27:11 32:3
  35:8
kind 39:25
King 1:19 57:24 58:4
  58:25
knew 17:10 42:18 53:4
  55:24
know 9:20,23 10:2,7
  13:3 21:14 24:12
  25:17 29:10,24 30:25
  31:1 33:7 39:15 40:4
  43:7 45:3 46:19,25
  49:5 50:3,20,22
  52:25 53:3,3,10,15
  54:24 56:3,6
knowledge 35:9 46:25
  55:6
KNOWN 58:3
Kurashima 12:14,16
  22:16,24 23:3,7 24:1
  24:11 25:1

**L**

lady 48:14
language 19:16
last 11:20 43:8,9 44:25
lawsuit 20:13,16,18,22

20:25 21:6,10,15
22:5,10 24:2,19 25:1
lawyer 13:6,14,17,19
14:14,15,21,21 15:12
15:18,22,25 16:1,22
18:22 19:1,2 23:20
23:21 25:8
leading 55:18
learn 16:6 17:7
leave 38:8 50:14 51:4
left 38:4,11,12,14,15,17
Legal 2:14
LEK 1:4 57:23
LESLIE 2:3
let 31:7 46:13
letter 3:20,23 26:4,9,19
26:22 27:1,5,18,22
28:1,2,4,18,21,24
29:2,6,11 31:8,15,17
31:20,22,24 32:13,14
32:24 33:11,22,24
34:4,7,10,12,14 37:9
37:11 46:14,19 49:12
49:15,18,21,23
letters 46:12,22
let's 7:23 17:22
lie 10:16,18
life 5:7
like 28:22 29:16 31:3
32:18 34:10 37:19
42:3 52:6
line 43:4
listened 25:4
live 4:25 5:1,8 33:16,19
44:13,23,24 50:13
lived 4:24 5:6 33:21
42:14,16 45:3
lives 33:14,19 44:11
53:22,25
lobby 38:19,20
long 5:6,8 6:11 7:6 28:7
29:16 39:17 50:20,25
51:3
longer 23:4
look 11:16 31:14
looked 42:3
lost 44:5,6 45:7 55:12
56:7
Louis 10:1 27:24 29:2,6
46:16
Louise 38:24
loved 42:17

**M**

made 52:10,13
maiden 4:11
mail 46:12,17
mailbox 41:2,10,11

mailed 46:10
Maili 38:24
Makawao 4:20 5:24
make 34:3,6 53:3,4,8
Malott 5:5
manager 36:9,11
many 5:12 41:4 42:23
March 37:6 49:4
marked 3:19 11:12,14
21:18,20 26:14,16
31:12
marriage 10:11
married 4:9 6:9,11
35:7 42:16
Mau 27:11
Maui 4:20,23 5:8,10,20
6:6
may 13:12 16:19 21:5
maybe 37:10 38:13
ma'am 4:7 13:3,12
17:18 23:24 45:14
means 10:15,16
Medeiros 4:8,12
medical 7:17
medications 7:15
medicine 8:8,10,16
medicines 7:21 8:21
meet 13:17 24:1,5
meeting 33:24 34:13
memory 8:3
mentioned 43:12
mertropozine(phone...
8:25
met 13:14,16,19 33:9
mic 26:6
microphone 19:12
mine 48:1
minutes 38:13 39:19
40:6
Moana 1:18 2:5,10
Mom 38:20
Monday 36:9,16
money 13:24 21:11,16
22:2 37:1,2 42:21
44:8 50:1,6 51:1,24
52:16,17,20,22,23
53:7,19 54:4 55:16
55:17
months 47:3 50:11
more 6:3 45:18 50:11
mortgage 10:25 13:23
16:25 17:1 28:8
30:21 42:21,21 44:20
45:8 47:16 48:21
49:6,6,25 50:7,15,17
50:21 51:1,3,9,15,18
51:25 52:7,10,13,24
54:17 55:3,24,25

most 24:19 25:1,12,14
mother 18:11,11 47:5,9
47:25 48:1,10,25
49:8,17
move 20:7 22:17 25:19
20:10 30:7 32:16
34:19 35:23 51:12,17
53:12
moved 6:15 12:5 34:23
51:20,21
much 30:25 43:24 44:2
47:6 50:3 53:4 54:22
Must 56:7
M-A-L-O-T-T 5:5

**N**

name 4:7,8,9,11 5:4,23
9:25 10:2 14:2,3 16:6
16:22 22:15,16 27:10
27:11,14 32:1,2
44:10
named 9:21
names 50:9
necessary 57:7
need 12:21 13:5,13
19:12 45:2
needed 13:20
nephew 46:8
never 47:24 53:19 56:3
56:6
next 4:17 39:9,13
Nguyen 10:3 39:2
nickname 27:15
niece 38:25 46:7,8
Nielsen 2:13
night 8:21 9:6,7
nine 5:13 42:25 43:5
nothing 42:5
nowhere 53:24
number 43:7

**O**

Oahu 5:2 6:15,17,21
oath 10:12
object 13:8 22:25 29:3
30:9 31:19 32:25
34:21,25 35:22,25
53:13
objecting 36:12
objection 15:2,19 20:1
20:6,17 21:1,4,6
23:13 24:20 25:21
29:13 36:22 39:23
41:20 55:18
off 19:13 26:6 41:12
office 1:17 16:7,9
officer 10:8 39:4
Oh 19:13 43:10 45:1

47:14
okay 15:11 17:3 20:25
23:25 45:25 53:25
54:4 55:19
old 4:13,14
oldest 5:15
one 8:25 16:24 17:1,2
17:16,16,17,19 18:1
23:6 46:12,14,24
47:1
only 9:6 29:18 43:14
order 44:18
ordered 51:12
Osborne 2:3 3:5,7,9,11
3:15 9:19 12:6,10
13:10 15:4,15,17,21
17:22 19:8,13 20:3,6
20:8,17 21:1,5,8
22:19,22 23:2,14
24:22,24 25:18,21
28:12,16 29:5,15
30:6,9 31:19 32:18
32:21 33:2 34:18,21
34:25 35:22 36:12,22
39:23 40:16 41:20
42:9 53:15 54:8
55:18,23 56:9
Osbsorne 3:13
osteoporosis 7:19 8:6
other 8:5,13,25 17:24
40:5 43:18 45:9
53:18 55:4
out 15:11 28:4 45:11
49:12 51:12,18
outcome 58:20
over 29:8 47:2,11
48:12
own 34:16 44:9 46:25
54:1,2,6
owned 52:2
owner 33:5

**P**

page 3:2 11:20
pages 58:12
paid 44:7 50:18 51:19
53:9 54:23 55:25
56:3,6
paper 31:2,2 35:21
47:15 55:2
papers 19:17 24:4,6
28:9 29:17 51:7,8
52:25 53:2
paperwork 54:16,19
55:7
Pardon 43:25
park 40:3
parked 39:15 41:10

part 15:24 22:4
particular 14:14,20
parties 36:13 58:18
pay 36:19 37:1 51:25
payment 53:3,5,8
payments 52:10,13
Pearl 6:18,19
pending 22:10
people 53:18
perception 42:3
perhaps 53:4
permission 22:3
person 9:20 10:2 39:1
41:2,13,24,25
phone 39:11 40:10
pick 15:17,21,24
picked 15:11 16:1
PJKK 1:17 2:4,9
Plaintiff 1:4,15 2:2
please 11:20 12:7 16:19
19:12 24:23 42:11
48:11,11 49:1 50:9
point 9:13 55:5
pointing 9:14
police 10:8 39:4,6
power 3:21 10:21 11:8
12:21 13:20 14:9,15
15:5 18:14,18 23:6
26:11 27:2 28:5 35:4
35:14 46:11
Pravastatin 8:24
prepare 11:7 12:11
prepared 19:16
present 24:8 33:4,5,9
36:1 37:16
pressure 7:25
presume 46:21
price 42:20 47:17
primarily 25:4,7
print 31:5 58:10
probably 51:22
problems 7:17,21
proceedings 58:14
process 32:5,6
promised 47:17,20
55:1
proper 13:9 23:1
propounded 58:8
Puana 1:6,13 3:3 4:1,8
5:14 9:10,18 11:4
12:22 13:4 22:4,17
32:22 38:2 43:2,22
46:5,6 57:2,11,23
public 2:9 5:24
purchased 45:12 50:12
purpose 13:22
put 19:12 41:11 46:11
46:17

**Q**

question 13:12 15:20
15:23 20:20 21:6
26:8 36:1,5 51:15
53:14
questions 23:13 24:21
25:17 28:13 34:18
45:15 54:9,11 55:20
56:9,10 58:7

**R**

Ranch 4:22
reach 47:24 49:16
read 27:8,20 28:24
32:10,11 34:10 56:11
57:3 58:12
really 28:23 42:19 45:2
reason 47:15
reasons 24:2
receive 28:9 52:20
recognize 11:17 21:22
26:18 31:15 41:13,15
record 9:17 36:20 57:6
records 36:7
reduced 58:10
referring 37:22
reflect 9:17
refused 35:20
regarding 54:16
related 10:9 58:18
relax 9:1,2
relevance 30:9 31:20
34:21 40:16 41:20
relevancy 25:21 36:22
remember 6:15 8:19
16:16 20:15,21 25:13
37:5,15
repay 50:21
repeat 24:23 26:7
Reporter 1:19 58:5
repossessed 52:5
representative 36:2
represents 22:13
response 56:5
rest 44:8
result 55:11
retain 22:23 23:3
retired 7:9
reverse 10:25 13:23
17:1 30:21 42:21
44:19 45:8 47:15,18
48:21 49:6,25 50:6
50:15 51:1,3,25
54:16 55:25
Rick 23:5 29:7
right 12:25 17:25 18:23
19:2,5,16 25:5 33:21
34:9,24 41:2 42:13

43:24 44:5,16,20
45:12,17 48:9 49:12
49:22 50:16,18 52:8
52:14,18 56:4
Rita 1:19 57:24 58:4,25
room 1:18 2:5,10 9:11
9:12
RPR 58:25
Rudy 46:5
running 21:3,5 23:12

**S**

sale 18:6
same 32:6 49:18
sat 38:19 39:9,20 40:6
satisfied 19:21
saw 41:1
saying 25:13
school 5:21,23,24,25
17:9
scope 15:3 20:1
Sea 7:3,7
seated 12:22 32:23
46:6
second 16:20 46:9
secured 54:5
see 11:21 15:1,4 16:14
16:17,19,20 46:13
selected 14:15 24:10
semiretired 23:22
send 29:1,6 30:1 53:19
sent 27:22 29:10,21
49:12
September 28:2 49:14
49:23 58:22
Services 2:14
shirt 9:16
shorthand 58:5,9
show 11:12 41:8
Showed 41:9
showing 21:18 26:14
31:11
siblings 55:4
sign 11:10 31:2 55:2
56:11 58:12
signature 11:21,23
26:21,24,25 31:17,18
57:1
signed 19:18 27:8,20
27:24 31:1 32:12
34:11 47:15
silver 40:22
Silvert 2:8 3:4,6,8,10
3:12,14 4:6 9:17,20
11:16 12:4 13:8 15:2
15:14,19 17:20 19:7
20:1,7,11,19 21:3,7,9
21:22 22:17,25 23:12

24:20 25:19 26:2,7
26:18 28:10 29:3,12
30:7,13 31:14,21
32:16,25 34:19,23
35:2 36:4,14,25
39:24 40:17 41:23
42:5 53:13 54:10,14
55:19 56:10
since 17:25
sister 47:25
sit 38:20 39:13
six 37:10
skill 58:14
sleep 9:1,4
small 31:4
sofa 39:20
sold 44:11
some 41:1
somebody 14:22
someone 16:14 37:19
something 9:1 43:21
sometime 51:22
son 5:15,16 9:10 11:2,3
13:4,13,16,24 15:10
15:11 18:8 22:4 24:8
24:10,14,16,25 25:3
25:7,11,15 31:6
32:22 33:4,9,18,18
33:19 36:8,9,17 37:2
37:19,22 38:1,15,16
38:20 39:12,13,17,25
40:11,20 41:16,17
42:11,22 43:6,14,21
44:10,13 46:4 51:1
52:21 53:7,22 55:2
son's 42:1 45:24,25
46:1,2 52:18
son-in-law 29:7 31:5
35:7 45:5 47:2
sorry 14:18 15:8,15
16:6,23 17:18 19:8
20:24 45:1,14,25
47:19
speak 16:3
special 43:20
speed 21:2
spell 28:4
spend 50:4
spent 21:12 30:25 50:3
spoke 14:10 15:7,8
16:2,7,24 18:4 24:19
24:25,25
ss 58:1
Star 7:3,6
state 1:20 29:12 58:1,5
statement 30:24 35:23
statements 28:8 30:15
31:9 35:10,17 36:18

36:24
States 1:1,3,16 2:4
57:23
stay 38:7
stenosis 7:19 8:14
still 6:13 22:10 44:9,13
51:14 53:22,25 54:6
street 2:14 41:10
strike 35:23 53:12
strumming 29:18
sue 24:3,6
sued 55:14
suing 21:11 22:1,8
Suite 2:14
summer 6:8 49:22
Summertime 6:7
Sunday 4:18
supposed 51:24
Sure 24:24
sworn 4:2 58:6

**T**

take 7:11,21,25 8:8,16
8:21 9:6 13:11 26:11
27:2 54:15,25
taken 1:15 57:4,24 58:4
58:9
taking 7:15 28:5 41:2
58:15
talk 13:13 14:8 17:23
34:14 37:12 53:17
talked 12:20 13:4
34:12 35:3
talking 16:24 17:21
25:12,14 37:25 38:1
telephone 47:11,25
tell 4:7 7:13 10:15,16
10:18 14:18,22 23:17
24:1 35:19 48:11,14
48:25
telling 24:18 47:8
ten 38:13
termination 46:10
testified 4:3
testify 10:13 58:7
testifying 58:6
testimony 20:17 31:19
42:10 47:23 57:6
58:14
thank 16:21 19:13
23:23 42:5 45:21
thereto 58:9
thing 8:5
things 21:2
think 8:11 13:20 20:23
20:24 25:11 34:23
41:18 50:5 55:4
thinning 8:6

third 36:13 43:5
thought 29:22
three 49:7 50:11
through 7:23 10:11
49:17
Throughout 49:24
time 7:12 10:20 19:2
20:5,12 26:3,8 29:18
29:20 30:14 31:8
32:3 33:10,21 38:4
39:20 40:5 47:16
49:11,18,19,20 50:17
50:25 51:6,11
times 41:4,6
timeshare 18:8
tired 38:11
today 7:13 10:13,18
42:11 54:6
together 24:16
told 13:17 14:17,19,23
15:1,4 16:10,14 17:2
17:15 18:10 24:13,14
25:11 27:7 28:23
30:4 31:2,5 32:6 34:9
34:17 35:24 36:9,11
36:13 38:20 39:13
47:9,14 48:9,10,21
48:22,24 50:8,10
53:11
total 42:24
totally 20:18
transcript 58:13
transcription 58:11
tried 36:6
true 25:12 34:5 57:5
58:13
trust 18:13
trusted 18:20,20 19:23
54:15
truth 58:7
truthfully 10:13
trying 30:15 31:9 48:8
turn 11:20
typed 18:17 27:18 32:8
typing 37:20

**U**

ukulele 29:19
uncle 46:7
under 58:11
understand 7:24 8:3,19
10:12 15:23,25 16:13
21:9 29:21 31:4
42:10 54:19,22
unidentified 36:1
uniform 39:7
United 1:1,3,16 2:4
57:23

| | | | 9 |
|---|---|---|---|
| until 51:3 | weren't 30:4 | 11 3:21 | 9-10-12 46:15 |
| upstairs 33:20 34:1 | we'll 13:10 | 11:05 56:12 | 9/10/12 3:20 |
| use 42:21 50:9 | we're 19:5 | 1111 2:14 | 94 4:14 |
| used 44:7 50:1 52:16 | we've 48:12 | 12 3:5 | 95 4:17 |
| 52:17 | white 40:1,21,23 | 13-00735 1:4 57:23 | 96813 2:5,10 |
| | whole 38:7 43:4 58:7 | 15 39:19 40:6 | 96816 2:15 |
| **V** | wife 29:23 | 1919 4:16 | |
| valve 8:15,15 | wishes 52:16 | 1941 6:16,18 | |
| very 47:17 | witness 3:2 4:2 9:14 | | |
| video 2:14 41:14,16,24 | 12:7 15:16 24:23 | **2** | |
| 41:25 42:3 | 29:14 36:23 41:21 | 2nd 58:21 | |
| Videographer 2:12 | 57:1,2 58:6,8,9,11 | 20 3:6 | |
| 19:11 26:6 | wondering 45:20 | 2000 48:20 | |
| videos 41:1,5,7 | word 37:21 | 2009 13:2 20:23,24 | |
| VIDEOTAPED 1:13 | wording 28:20 | 48:21 51:5,10,11,13 | |
| voir 3:5,7,9,11 12:6,9 | words 28:23 | 51:15 52:6 | |
| 13:9 15:3 20:2 22:19 | work 6:21 7:6 47:6 | 2010 49:22 | |
| 22:21 23:1 28:12,15 | worked 6:7,8 7:3 17:9 | 2012 28:3 49:14,23 | |
| 29:4 32:18,20 33:1 | working 7:11,12 | 2013 20:24 32:15 37:7 | |
| vs 1:5 57:23 | worried 51:8 | 51:22 | |
| | worry 55:1 | 2014 1:15 51:5,13 57:4 | |
| **W** | wouldn't 47:6 | 58:22 | |
| wait 39:14 | wrist 38:10,10 | 21 1:15 3:22 57:4 | |
| waited 28:7 29:16 49:7 | write 17:16 27:5,7 | 22 3:7 5:9 | |
| walk 40:14 | 28:17 31:21 32:6 | 24th 4:16 | |
| walked 41:11 | 33:10 34:17 55:2 | 26 3:8,20 | |
| want 16:20 17:23 30:23 | writing 32:23 33:22 | 28 3:9 | |
| 37:12 | written 33:25 34:13 | 29th 32:14 | |
| wanted 10:25 11:5 | wrong 40:24,25 42:11 | | |
| 13:21 16:4,17 18:7 | wrote 17:13 26:3,8 | **3** | |
| 19:22 23:17 24:3,6 | 27:1,6 28:24 31:8,24 | 3 19:5 | |
| 25:17 28:23 31:1 | 33:12 34:10,16 37:8 | 3rd 44:25 | |
| 42:15,19 44:15,17 | 37:10 | 30 3:10 | |
| 46:24 50:23 51:2 | | 300 1:17 2:5,10 | |
| wanting 45:2 | **Y** | 31 3:23 | |
| wasn't 39:8 51:18 | Yano 14:24,25 16:14 | 32 3:11 7:8 | |
| watched 41:4 | 16:15 17:6,8 23:9,9 | 35 3:12 | |
| way 58:17,19 | 23:10,14,17,20 24:12 | 373 58:25 | |
| wearing 9:15,16 39:6 | 24:14 27:24 46:18,18 | | |
| week 4:17 | Yeah 18:25 34:25 | **4** | |
| well 10:10 12:19 13:1 | year 44:25 49:5 51:20 | 4 3:4 | |
| 13:10 14:10,17,23 | 51:20 | 42 3:13 | |
| 15:7,24 16:1,7,10,15 | years 4:14 5:9 6:12 7:8 | | |
| 17:22,25 23:4 24:4 | 47:3 49:7,7 | **5** | |
| 25:11 34:5,9 36:8 | younger 41:22,25 | 500 2:14 | |
| 39:22 40:22 47:2 | youngest 5:15 43:2,6 | 54 3:14 | |
| 48:20 49:14 50:14 | 43:11,14 | 55 3:15 | |
| 54:7 | | | |
| went 5:24 6:1 14:24 | **$** | **6** | |
| 16:7,11,17 17:9,10 | $240 36:24 | 6-100 1:18 2:5 | |
| 24:13,16 31:6 36:17 | | 64 6:12 | |
| 37:2 38:14,19 39:14 | **0** | | |
| 39:15 47:1,3,3 51:1 | 09 20:24 | **7** | |
| 54:4 | | 7th 13:2 | |
| were 4:19 5:20 6:11 | **1** | 7-104 2:10 | |
| 19:21 25:16 28:4 | 1/29/13 3:23 | | |
| 30:14 40:24 43:20 | 10th 28:3 49:14 | **8** | |
| 45:14 58:9 | 10:05 1:16 | 8-21-14 57:24 | |